UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WISLER MARCELUS,              ) | |
|              ) | |
| Plaintiff,              ) | |
|              ) | |
| v.              ) | Civil Case No. 07-0721 (RJL) |
|              ) | |
| CCA OF TENNESSEE, INC.,              ) | |
|              ) | |
| Defendant.              ) | |
|              ) | |
|              ) | |

MEMORANDUM OPINION
(March 3rd, 2010) [#28]

Wisler Marcelus ("plaintiff") brings this lawsuit against his former employer, CCA of Tennessee, Inc. ("defendant"), alleging claims for discrimination, retaliation, and breach of contract in connection with his termination as a correctional officer at the DC Jail. The Court having previously dismissed the plaintiff's claims for retaliation and breach of contract, all that remain are his claims of discrimination. *See Marcelus v. Corrs. Corp. of Am./Corr. Treatment Facility*, 540 F. Supp. 2d 231 (D.D.C. 2008). The plaintiff alleges that the defendant terminated his employment on account of his national origin and age in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA"), respectively. (Am. Compl. [#15] ¶ 1).[1] The

---

[1] Plaintiff's Complaint also raises potential claims of harassment and hostile work environment on account of his national origin. He alleges, for instance, that co-workers and supervisors taunted him with derogatory names like "Haiti-Man" and "Voodoo Man." (Compl. [#1] ¶¶ 1, 10-13; Am. Compl. [#15] ¶¶ 1, 10-13). As the Court observed in its Memorandum Opinion dismissing the plaintiff's retaliation and breach of contract claims, the plaintiff did not oppose the defendant's argument against his harassment and hostile

defendant now moves for summary judgment on the ground that the plaintiff's discrimination claims fail as a matter of law. Having reviewed the pleadings and the record, the Court GRANTS the defendant's motion.

## BACKGROUND

The plaintiff was born in Haiti in 1947. (Marcelus Dep. [#28-4] at 9). The defendant hired him as a correctional officer at the District of Columbia Correctional Treatment Facility ("CTF")[2] in 2002. (Am. Compl. [#15] ¶ 9). A couple of years later, the plaintiff began working in one of the CTF's two Special Management Units ("SMUs"), which house inmates who need special protection or who pose a threat to other inmates. (Pl. Opposing Facts [#35] ¶¶ 11-12, 19). Although there is some disagreement about whether the plaintiff had timely received the necessary specialized training for that job assignment, (*Id.* ¶ 13), there is no disagreement that he was well aware of the policy prohibiting two or more inmates from leaving their cells at the same time, (*Id.* ¶¶ 14-16). The defendant contends that the plaintiff violated this policy and lied about it. Not surprisingly, the plaintiff contends that he did nothing wrong and that his termination was actually the result of discrimination on account of his Haitian descent and his age.

The plaintiff's discrimination claims arise from an incident that occurred on September 3, 2004. The plaintiff was escorting an inmate out of the cell block when another inmate exited his cell. (Marcelus Dep. [#28-4] at 25; Pl. Opposing Facts [#35] ¶ 21).

---

work environment claims. (Mem. Op. [#11] at 3 n.3). As a result, the Court did not address those claims based on its belief that the plaintiff was not pursuing them. (*Id.*). Nothing in the plaintiff's summary judgment briefing changes this belief. Because the plaintiff has made no effort to defend or otherwise pursue his harassment and hostile work environment claims, the Court considers those claims to be waived.

[2] The defendant operates the CTF, also known as "DC Jail." (Am. Compl. [#15] ¶ 8).

2

Suddenly, the inmate that the plaintiff was escorting broke away and attacked the other inmate. (Marcelus Dep. [#28-4] at 25; Pl. Opposing Facts [#35] ¶ 23). Responding to the plaintiff's call for assistance, an officer from the other SMU helped regain control of the inmates. (Marcelus Dep. [#28-4] at 34). Following the altercation, the plaintiff completed an incident report in which he explained that the unescorted inmate was able to leave his cell because the lock on the cell door was broken. (*Id.* at Ex. 2).

In accordance with CTF procedures, the assistant chief of security conducted an investigation of the incident. (Pl. Opposing Facts [#35] ¶ 32). After interviewing both inmates, he concluded that their accounts differed from the plaintiff's. (Rychen Decl. [# 28-8] ¶ 7). Contrary to the plaintiff's explanation that the cell lock had malfunctioned, both inmates suggested that the plaintiff had actually authorized the unescorted inmate to leave his cell for a shower privilege. (*Id.* ¶¶ 5-7). In light of these conflicting accounts, the assistant chief asked CTF's locksmith to inspect the lock. (*Id.* ¶ 8). The locksmith reported that he had repaired the lock before the incident and that it was working properly when he inspected it on September 4, the day after the incident. (Flores Decl. [#28-9] ¶¶ 4-5). Given this information, the assistant chief concluded that the plaintiff had violated CTF policy by allowing the two inmates out of their cells at the same time and that he had falsified information in his incident report. (Rychen Decl. [#28-8] ¶ 10). The assistant chief then prepared a report recommending that the warden issue a Problem Solving Notice ("PSN")[3] to the plaintiff. (*Id.*).

---

[3] A PSN is a formal charge of misconduct that informs the employee about possible disciplinary action. (Figueroa Decl. [#28-3] ¶ 7).

3

Following the investigation, the plaintiff received a PSN and eventually met with the warden to discuss the charges. (Marcelus Dep. [# 28-4] at 64-65, Ex. 9). At the meeting, the warden reviewed the plaintiff's file and then asked the plaintiff about what had happened. (*Id.* at 68). After the plaintiff recounted the facts that he had detailed in his incident report, the warden terminated the plaintiff's employment and asked him to leave the premises. (*Id.*). The warden reached this decision based on his finding that the plaintiff had violated the CTF policy against allowing more than one inmate out of their cells at the same time. (*Id.*). The warden also took account of a previous incident in which the plaintiff was suspended (but not fired) for violating CTF policy during a physical altercation between a fellow correctional officer and an inmate. (*Id.*; Pl. Opposing Facts [#35] ¶ 26-28). In addition, the warden decided that termination was appropriate because he believed that the plaintiff had lied. (Marcelus Dep. [#28-4] at 68). The plaintiff eventually received a letter from CCA confirming that his termination was effective on October 11, 2004.[4] (Am. Compl. [#15] ¶ 26.)

Not long thereafter, the plaintiff filed an Equal Employment Opportunity Commission ("EEOC") charge alleging "national origin" and "age" discrimination. (Def. Mot. for Partial Dismissal [#7] at Ex. A [#7-2]). In the EEOC charge, the plaintiff claimed that he was used as a "scapegoat" so that prison officials could defend themselves against a lawsuit filed by the victim-inmate. (*Id.*). He also claimed that younger employees of other national origins had been suspended, not terminated, in similar circumstances. (*Id.*). After

---

[4] In its Answer, the defendant states that "the letter incorrectly stated that Plaintiff's termination was effective as of October 11, 2004; Plaintiff's termination was effective as of September 30, 2004." (Answer [#6] ¶ 26). This discrepancy is not material for purposes of resolving the defendant's summary judgment motion.

the EEOC issued a right to sue letter, the plaintiff initiated this lawsuit. CCA filed its Answer and now moves for summary judgment on the plaintiff's discrimination claims.

## STANDARD OF REVIEW

Summary judgment is proper where the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). If a motion for summary judgment is properly supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). To the extent that the non-moving party offers evidence in response, that evidence "is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

The plaintiff's claims are rather straightforward. He alleges that the defendant fired him simply because of his national origin and age. It is unlawful under Title VII of the Civil Rights Act for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). This statute establishes just two elements for an employment discrimination claim: "(i) the plaintiff suffered an adverse employment action (ii) because of the employee's . . . national origin." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). If the employee has suffered an adverse employment action and if the

5

employer has asserted a legitimate, non-discriminatory reason for that action, then this Court need only determine at the summary judgment stage whether the "employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of . . . national origin." *Id.* at 494. The same approach applies as well to age discrimination claims under the ADEA. *See Brown v. Brody*, 199 F.3d 446, 456 n.10 (D.C. Cir. 1999), *abrogated on other grounds by Steele v. Schafer*, 535 F.3d 689 (D.C. Cir. 2008) (stating that courts "routinely apply the same standards to evaluate Title VII claims as they do ADA claims, ADEA claims, and even ERISA claims").

There is no doubt that the defendant's decision to discharge the plaintiff is an adverse employment action. The defendant justifies this decision on grounds that the plaintiff violated CTF policy, that he lied about it, and that he had been suspended once already for violations of CTF policy in connection with a physical altercation. (Def. Summ. J. Br. [#28] at 12-13).[5] Not surprisingly, the plaintiff contends that these non-discriminatory reasons are mere *pretexts* for the discriminatory animus that really motivated the defendant's decision. I disagree.

To prove discriminatory intent, the plaintiff makes two arguments. First, he challenges the defendant's conclusion that he violated CTF policy and that he falsified his incident report. In essence, the plaintiff contends that he did nothing wrong and that to the

---

[5] The plaintiff claims that the defendant never raised his prior suspension as a basis for his termination, (Pl. Opp. [#36-1] at 38), but this claim is belied by his own deposition where he testified that the warden specifically mentioned the prior incident, (Marcelus Dep. [#28-4] at 68).

6

extent the defendant found otherwise, it was because the defendant "conducted an investigation that was biased and flawed from its inception" and was "pre[-]designed to achieve the results that [the defendant] wanted." (Pl. Opp. [#36-1] at 35). To support this claim, the plaintiff cites a litany of errors made by the assistant chief of security who conducted the investigation and by the warden who made the final decision to terminate the plaintiff's employment. He contends, for instance, that their reliance on the statements of both the locksmith and the victim-inmate was misplaced because those statements lacked credibility. (*Id.* at 36-37). He also contends that the defendant mischaracterized the other inmate's account of the incident. (*Id.* at 37). More importantly, the plaintiff claims that the veracity of his account is supported by the declaration of the corrections officer assigned to the preceding shift who was not interviewed during the investigation but has since confirmed that the cell lock was not functioning properly on the morning of September 3. (*Id.*). That the lock had malfunctioned is not unusual, says the plaintiff, because it is common knowledge that the cell locks frequently break when inmates repeatedly kick them, as the victim-inmate had done the night before the incident. (*Id.* at 37-38). Finally, the plaintiff points to positive performance reviews that he claims the defendant disregarded in reaching its decision to fire him. (*Id.* at 38). To the plaintiff, these defects collectively demonstrate that the defendant was biased against him. Not quite!

Even if the plaintiff is correct that the investigation and his subsequent discharge were somehow unfairly rigged,[6] that fact *alone* does not establish unlawful discrimination on account of national origin or age. The anti-discrimination statutes "[do] not hold

---

[6] Of course, the Court renders no judgment on that allegation.

7

employers liable for erroneous judgment, unless that judgment is motivated by an illegal discriminatory motivation." *Phillips v. Holladay Prop. Servs., Inc.*, 937 F. Supp. 32, 37 (D.D.C. 1996). In short, the law does not prohibit employers from treating their employees "unfairly" so long as that treatment is not the product of *unlawful* discriminatory intent. It bears emphasizing that the federal courts are not empowered by the civil rights laws to referee every dispute or to remedy every wrong that might arise from an employment decision. More aptly put, the Court is not a "super-personnel department." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986). As such, it may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotation marks omitted). The Court's task is limited to determining whether an employee's factual allegations actually raise a triable issue of employment discrimination on the basis of race, color, religion, sex, or national origin. *Brady*, 520 F.3d at 494. Charges of unfairness, no matter how well-founded, do not *by themselves* prove unlawful discrimination. After all, the anti-discrimination statutes do not make "an employer liable for simply . . . arbitrary decisions." *Friedel v. City of Madison*, 832 F.2d 965, 973 (7th Cir. 1987). To survive summary judgment, therefore, the aggrieved employee must point to some evidence that the decision—even if wrong or unfair—was based on discriminatory animus.[7]

---

[7] The case law on this point is overwhelming. *See, e.g., Waggoner v. City of Garland*, 987 F.2d 1160, 1166 (5th Cir. 1993) (stating that evidence of innocence contrary to the allegations relied upon by the employer is irrelevant unless the employee can "produce evidence demonstrating that [the employer] did not in good faith believe the allegations, but relied on them in a bad faith pretext to discriminate against him *on the basis of his age*"); *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 507 F. Supp. 2d 93, 110 (D.D.C. 2007) ("It may be that the decision to terminate the plaintiff was . . . , on balance,

The plaintiff's second argument is an attempt to do that. He contends that the defendant treated two co-workers more leniently even though they had committed similar or more egregious infractions because they are of a different national origin and are younger than the plaintiff. This disparate treatment argument ultimately fails, however, because the officers who the plaintiff references are not similarly situated to him. To establish that a comparator is similarly situated for purposes of proving disparate treatment, the plaintiff must show that he and the comparator were charged with "offenses of 'comparable seriousness,'" *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999), and that "all of the relevant aspects of [his] employment situation were 'nearly identical'" to the comparator's employment situation, *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995). Unfortunately, he didn't.

The plaintiff points first to Officer Peyton who received a five-day suspension for violating CTF's segregation management policy by entering an inmate's cell without securing the inmate and without notifying a supervisor, which ultimately resulted in a physical altercation. (Pl. Opp., Ex. E [#35-5] at DEF 0389). The plaintiff claims that Officer Peyton committed a more serious infraction, yet he only received suspension, not termination. (Pl. Opp. [#36-1] at 33). Specifically, the plaintiff contends that Officer

---

unfair, but the plaintiff has provided no evidence at all that it was motivated by his employer's discriminatory intent, and that is the question that the Court must answer."); *Agugliaro v. Brooks Bros., Inc.*, 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status."); *Grier v. Casey*, 643 F. Supp. 298, 308 (W.D.N.C. 1986) ("The law is clear that an employer's reason for his action may be a good reason, a bad reason, a mistaken reason, or no reason at all, as long as the decision was not based on race and/or sex or other unlawful discriminatory criteria.").

Peyton deliberately violated CTF policy; whereas, the plaintiff's infraction was unintentional—the result of a malfunctioning lock. (*Id.*). Even assuming that the defendant was mistaken in believing that the plaintiff knowingly violated CTF policy, or worse yet, assuming that the defendant intentionally rigged the outcome of the investigation, the plaintiff and Officer Peyton are not similarly situated because Officer Peyton, unlike the plaintiff, was not involved in more than one physical altercation. Because no one can know how the defendant would have treated Officer Peyton if he had been the target of a second investigation involving a violent incident at CTF, there is no basis for concluding that the defendant treated Officer Peyton any more leniently than the plaintiff. Indeed, the defendant treated them quite similarly: Like the plaintiff, Officer Peyton was suspended after his first infraction involving a physical altercation. (Pl. Opp., Ex. E [#35-5] at DEF 0389). It is also worth noting that the defendant ultimately fired Officer Peyton for the seemingly lesser offense of failing to provide documentation supporting his use of bereavement leave. (Pl. Opp., Ex. E [#35-5] at DEF 0390). On these facts, a reasonable juror could not find disparate treatment sufficient to support an inference of unlawful discriminatory intent.

  The plaintiff turns next to Officer McDade who was neither suspended nor terminated for his involvement in an altercation with an inmate who attempted to escape from an unsecured cell. (Pl. Opp., Ex. G [#35-7] at DEF 0373). When Officer McDade suspected that an inmate's cell was unlocked, he asked for assistance from another officer and then proceeded to check the cell. (*Id.*). When the inmate tried to force his way out, the two officers pushed him back in and secured the door. (*Id.*). The plaintiff contends that this

incident was similar to his, yet Officer McDade was not discharged. (Pl. Opp. [#36-1] at 33). Furthermore, the plaintiff claims that this event was the second time Officer McDade had been involved in a serious incident that endangered him or others. (*Id.* at 34). Earlier, he had been suspended for inadvertently discharging his firearm in a van while transporting inmates. (*See* Pl. Opp., Ex. H [#35-8] at DEF 0379). In response, the defendant explains that Officer McDade was not disciplined—nor should he have been disciplined—for the first incident because he acted properly under the circumstances by identifying the unsecured cell, by calling for assistance, and then by taking action to secure the inmate in the cell. (Figueroa Second Decl. [#37-3] ¶ 8). Thus, because Officer McDade has had only one serious infraction (the accidental firearm discharge), the defendant contends that he is not a proper comparator. I agree that Officer McDade's conduct is not sufficiently similar to the plaintiff's conduct to form an adequate basis for comparing the defendant's treatment of the two officers. Even if I were to accept the plaintiff's account that the lock was broken and that the defendant's finding to the contrary was erroneous, the plaintiff's conduct was nevertheless substantially different than Officer McDade's conduct. In his declaration, the plaintiff states that he knew the lock was broken and that he requested back-up assistance as a result. (Marcelus Decl. [#35-3] ¶ 9). He then notes that the back-up officer did not arrive until after the altercation had occurred. (*Id.*). If so, then the plaintiff must have failed to confirm that the lock had been secured and that back-up was on site before removing the inmate who caused the fight from his cell. Unlike the plaintiff, however, Officer McDade took immediate action to investigate the unsecured cell with the assistance of another officer, and in doing so, he managed to keep the inmate from escaping. Given that the two

officers responded differently when confronted with the problem of an unsecured cell, the defendant had good reason for treating them differently.

In any event, even if Officer McDade was similarly situated with respect to the plaintiff yet was treated more favorably, a single incident of disparate treatment cannot *by itself* suffice to convince a reasonable trier of fact that the defendant discriminated on an unlawful basis. "[T]o hold otherwise would be to permit the inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably." *Simpson v. Kay Jewelers*, 142 F.3d 639, 646 (3d Cir. 1998). One instance of disparate treatment hardly constitutes a pattern that would justify an inference of intentional discrimination, especially where the plaintiff offers no other evidence that the decision-makers in this case—the assistant chief and the warden—have ever harbored any discriminatory animus toward persons of Haitian descent or toward older persons. Although the plaintiff has alleged that certain co-workers and supervisors called him derogatory names like "Haiti-Man" and "Voodoo Man," (Compl. [#1] ¶¶ 1, 10-13; Am. Compl. [#15] ¶¶ 1, 10-13), he cites no evidence, nor even makes an allegation, attributing those disparaging words to the actual decision-makers, (*see* Marcelus Decl. [#35-3] ¶ 5). Indeed, the plaintiff even testified in his deposition that he had no reason to think that the assistant chief conducted the investigation in bad faith. (Marcelus Dep. [#28-4] at 46). Nor could the plaintiff recall a single instance that would indicate that the warden disliked him or was "out to get" him. (*Id.* at 76). Furthermore, the plaintiff's claim of discriminatory animus is undermined by the simple fact that the defendant hired him in

the first place. "From the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes . . . , only to fire them once they are on the job." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) (internal quotation marks omitted). In short, the plaintiff's evidentiary proffer—even when viewed in the light most favorable to the plaintiff—is not sufficient to overcome the summary judgment bar.

## CONCLUSION

Because this case is devoid of evidence that would convince a reasonable jury that the defendant terminated the plaintiff's employment on account of his Haitian descent or his age, the defendant is entitled to judgment as a matter of law. Accordingly, the Court GRANTS the defendant's Motion for Summary Judgment. An Order consistent with this decision accompanies this Memorandum Opinion.

_____
RICHARD J. LEON
United States District Judge